**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MEGATRON MUSIC MANAGEMENT, INC.,

*Plaintiff,*

v.

ENERGY BBDO, INC.,

*Defendant.*

Civil Action No. 21-69
(JMV) (MF)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

In this case, Plaintiff alleges that Defendant tortiously interfered with a contract between Plaintiff and a third-party.  Presently before the Court is Defendant's motion to dismiss Plaintiff's First Amended Complaint ("FAC").  The Court reviewed all submissions made in support of the motion[1] and considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1(b).  For the reasons that follow, Defendant's motion to dismiss is **GRANTED**.

---

[1] Defendant's brief in support of its motion to dismiss will be referred to as "Def. Br.," D.E. 8.  Plaintiff's opposition brief will be referred to as "Opp. Br.," D.E. 14.  Defendant's reply brief will be referred to as "Reply," D.E. 17.

## I.      FACTS AND PROCEDURAL HISTORY[2]

Plaintiff Megatron Music Management, Inc. ("Megatron") is a music royalty administrator. FAC ¶ 9.  Megatron has served as the exclusive administrator of the musical catalog of Miles, Inc. and its successors-in-interest, the Bayer Corporation and Bayer Healthcare LLC (collectively, "Bayer") since 1989.  *Id.*  Defendant Energy BBDO, Inc. ("eBBDO") is Bayer's primary advertising agency, engaged to promote Bayer's healthcare products.  *Id.* ¶ 10.

When eBBDO creates advertisements on Bayer's behalf, Bayer outright purchases the original music compositions used.  *Id.* ¶ 11.  The FAC explains that pursuant to copyright law, broadcasters as well as cable and satellite transmitters are required to obtain a copyright holder's permission to perform a musical composition on the air.  *Id.* ¶ 12.  Musical rightsholders typically delegate the authority to license their musical works to a "performing rights organization" ("PRO"), which, in turn, issues licenses to broadcasters in exchange for quarterly royalties.  The PROs then distribute the royalties to their respective composers and publisher members.  *Id.*  In order for PROs to fairly distribute the royalties, rightsholders are required to report to the PRO (1) the existence of that rightsholder's rights in, and the composers of, each new musical work, and (2) the time and channel of each airing of an advertisement containing that musical work.  *Id.* ¶ 13.

Bayer is, "[b]y virtue of its acquisition of musical compositions," a music publisher.  *Id.* ¶ 14.  Because Bayer lacks the expertise to manage its reporting requirements to PROs, Bayer engaged Megatron to administer its musical catalog.  *Id.*  In January of 1989, Bayer's wholly-

---

[2] The facts are derived from the FAC.  D.E. 5.  When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

owned subsidiary and predecessor-in-interest entered into an exclusive administration agreement (the "1989 Agreement") with Megatron.  *Id.* ¶ 15.  Pursuant to the agreement, Megatron was retained as Bayer's "sole and exclusive music publisher's royalty collection agent and copyright administrator throughout the world."  *Id.*  Megatron was granted "the exclusive right to submit and/or supervise the submission by [Bayer] . . . of all materials . . . to the applicable performing rights societies and/or all others to whom submissions are required in order to facilitate payment of royalties due [Bayer] for the use of" Bayer's musical compositions.  *Id.* (alterations in original).  Megatron receives a twenty percent commission of royalties obtained.  *Id.*

To administer Bayer's catalog, Megatron requires information, such as which new Bayer advertisements contain original music acquired by Bayer, copies of the music purchase agreements, and copies of the recordings of the musical composition.  *Id.* ¶ 16.  Over the course of Megatron's administration of Bayer's musical catalog, it has regularly communicated with eBBDO for this information.  *Id.* ¶ 17.  eBBDO has been "well aware for decades of Megatron's relationship with Bayer."  *Id.*  The FAC alleges that in August 2018, eBBDO suddenly stopped cooperating with Megatron.  *Id.* ¶ 18.  Despite Megatron's repeated requests to obtain information and documents from eBBDO, eBBDO did not provide the information.  *Id.*  Megatron reported eBBDO's failure to cooperate to Bayer, but eBBDO still refused to communicate with Megatron. *Id.*

Megatron alleges that "[o]n information and belief," Bayer breached its exclusive agreement with Megatron in or about December 2018 by entering into a new administration agreement with eBBDO.  *Id.* ¶ 19.  eBBDO subcontracted the administration work to Sony/ATV Music Publishing LLC and Sony/ATV Songs LLC (collectively, "Sony"), and Melos Publishing Services, Ltd. ("Melos").  *Id.* ¶ 19.  As of the time the FAC was filed, Bayer had not terminated

the 1989 Agreement,[3] however, it refused to cooperate with Megatron and diverted "all requisite information to eBBDO and its subcontractors." *Id.* ¶ 20. Megatron informed Sony through letters on November 4 and 12, 2019, and informed Melos through a June 16, 2020 letter, that the 1989 Agreement was still in effect and Megatron remained Bayer's exclusive administrator. *Id.* ¶ 21. The FAC alleges "on information and belief" that since late 2018, Sony and Melos have continued to register Bayer-owned musical compositions with PROs and have obtained tens of thousands of dollars in royalties. *Id.* ¶ 22. In 2018, Megatron registered with the relevant PRO a musical composition entitled "Wrong Car," which was purchased by Bayer for use in advertising Alka-Seltzer. *Id.* ¶ 23. Megatron alleges that "[o]n information and belief, Sony created a second registration for the same musical composition in December 2018. *Id.* ¶ 24. As a result, money that should have been payable to Megatron was wrongfully diverted to Sony. *Id.*

Plaintiff filed a Complaint in the Superior Court of New Jersey, Law Division, Morris County, on December 2, 2020. D.E. 1-1. Defendants removed the matter to this Court on January 4, 2021. D.E. 1. On January 20, 2021, Plaintiff filed a FAC. D.E. 5. The FAC names eBBDO, Sony, and Melos as Defendants and asserts three causes of action. Count One alleges tortious interferences against eBBDO, Count Two alleges tortious interference against all Defendants, and Count Three seeks a permanent injunction against all Defendants.

Defendants eBBDO and Sony/ATV Music Publishing LLC then filed the present motion to dismiss, D.E. 8, which Plaintiff opposed, D.E. 14, and to which eBBDO and Sony/ATV Music Publishing LLC replied, D.E. 17. On May 5, 2021, Defendants Sony/ATV Music Publishing LLC,

---

[3] Plaintiff's opposition brief indicates that the 1989 Agreement was terminated on January 25, 2021. Opp. Br. at 4.

Sony/ATV Songs LLC, and Melos Publishing Services LLC were dismissed from the action.  D.E. 19.

## II.    STANDARD OF REVIEW

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols., LLC*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

### III.    ANALYSIS

Defendants' motion to dismiss first argues that this Court lacks personal jurisdiction over Sony.  Def. Br. at 9-11.  Sony was previously dismissed from this action, therefore, the issue is now moot.  Additionally, Plaintiff indicates in its opposition brief that its "request for a permanent injunction is . . . moot" in light of Bayer's termination of the 1989 Agreement.  Opp. Br. at 1-2. As a result, the Court dismisses Count Three.  What remains of the FAC are two counts of tortious interference (Counts One and Two) against Defendant eBBDO.

In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  The parties both appear to assume that New Jersey law governs this dispute. Def. Br. at 13; Opp. Br. at 4.  Seeing no clear reason to deviate from the parties' assumptions, the Court will apply New Jersey law.  *See Manley Toys, Ltd. v. Toys "R" Us, Inc.*, No. 12-3072, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the . . . claims as though New Jersey substantive law applies, the Court will assume that to be the case." (citing *USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999))).

### A.  Elements of Tortious Interference

The parties dispute the appropriate elements for tortious interference.  Defendant submits that a plaintiff must allege "(1) the existence of the contract[;] (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages."  Def. Br. at 13 (alteration in original) (quoting *Amgro, Inc. v. Lincoln Gen. Ins. Co.*, 361 F. App'x 338, 345 n.9 (3d Cir. 2010)).  Pursuant to this standard, Defendant argues that Plaintiff failed to state a claim because Plaintiff has not alleged that eBBDO acted with the requisite malice.  Def. Br. at 13-16.

6

In opposition, Plaintiff submits that malice is no longer a required element of tortious interference. Opp. Br. at 4-5. Plaintiff argues that the required elements to state a claim for tortious interference are "(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage." *Id.* (quoting *Veverka v. Royal Caribbean Cruises Ltd.*, 649 F. App'x 162 (3d Cir. 2016)).

In 1989, the New Jersey Supreme Court included malice as an element of tortious interference. *Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31, 37 (N.J. 1987) ("[T]he complaint must allege facts claiming that the interference was done intentionally and with 'malice.'"). The *Sharp* court explained that "[f]or purposes of this tort, '[t]he term malice is not used in the literal sense requiring ill will toward the plaintiff,'" but "[r]ather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Id.* at 37 (second alteration in original) (quoting *Restatement (Second) of Torts* Chapter 37 at 5 (introductory note) (1979)). The court in *Sharp* noted that the *Restatement*'s definition of the tort did not include the word "malice" and, instead, required that the interference be "improper." *Id.* Despite this difference in terminology, the New Jersey Supreme Court explained that "for our purposes it is sufficient to record our conclusion that the *Restatement* test is substantially similar to the 'malice' standard currently applied by New Jersey courts." *Id.*

More recently, the New Jersey Supreme Court defined the tort by using the elements as provided in the *Restatement* and explained that the

> general rule defining the elements of tortious interference with an existing contract is: "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to

7

> liability to the other for the pecuniary loss resulting to the other from
> the failure of the third person to perform the contract."

*Nostrame v. Santiago*, 61 A.3d 893, 901 (N.J. 2013) (quoting *Restatement (Second) of Torts* § 766

(1979)).  While Plaintiff is correct that the word "malice" is absent from this definition, the court

provided no indication that it was deviating from the standard it set forth in *Sharp*.  Since *Sharp*,

New Jersey courts have continued to recite "malice" as an element of the tort.  *See, e.g.*, *Vosough*

*v. Kierce*, 97 A.3d 1150, 1159 (N.J. Super. Ct. App. Div. 2014) ("The tort of interference with a

business relation or contract contains four elements: (1) a protected interest; (2) malice – that is,

defendant's intentional interference without justification; (3) a reasonable likelihood that the

interference caused the loss of the prospective gain; and (4) resulting damages.").

There does not appear to be a distinction in New Jersey case law between interference with

"malice" and interference that is intentional and improper.  As a result, this Court will use the New

Jersey Supreme Court's most recent statement of the tort's elements, as provided in *Nostrame*.

Thus, to state a claim for tortious interference with an existing contract, Plaintiff must allege that

Defendant "intentionally and improperly interfere[d] with the performance of a contract . . .

between another and a third person by inducing or otherwise causing the third person not to

perform the contract."  *Nostrame*, 61 A.3d at 901.

### B.  Sufficiency of the Allegations in the FAC

Count One alleges that by refusing to furnish to Megatron the information necessary for

Megatron to perform its duties, eBBDO induced Bayer to breach the 1989 Agreement.  FAC ¶¶

13-14.  Count Two alleges that eBBDO interfered with Megatron's capacity to register Bayer-

owned works with the PROs by creating duplicate registrations "in order to wrongfully divert to

[itself] royalties properly flowing through Megatron and subject to Megatron's commission."  *Id.*

¶ 13.

Defendant argues that Plaintiff failed to allege that it acted with the requisite malice because it is "well-settled under New Jersey law" that competitors are privileged to interfere with each other's prospective and existing business relationships, so long as they do not resort to "wrongful means." Def. Br. at 13. In support, Defendant cites an unpublished New Jersey Superior Court case from 2018, and asserts that malicious conduct includes violence, fraud, misrepresentation, intimidation, threats, and violations of the law. *Id.* at 13-14. Because the FAC does not allege conduct rising to the requisite level, Defendant continues, Plaintiff has failed to plausibly allege malice. *Id.* at 14-16.

Plaintiff responds that Defendant misconstrues the unpublished 2018 Superior Court case. Opp. Br. at 12-13. According to Plaintiff, that case was based on *Nostrame*, and the "key feature" of *Nostrame* was that competitors are only privileged to interfere with contractual relationships that are prospective or terminable at will. *Id.* at 13. Plaintiff submitted a Declaration along with its opposition brief which indicates that the 1989 Agreement was not terminable at will.

In *Nostrame*, the New Jersey Supreme Court indicated that whether the tortious interference was with an existing contract or with a prospective relationship, "liability rests upon whether the interfering act is intentional and improper." 61 A.3d at 900-01. *Nostrame* provides examples of conduct that has been deemed wrongful, including "acts that amount to fraud or defamation"; deceit and misrepresentation; and "violence, fraud, intimidation, misrepresentation, criminal or civil threats, and/or violations of the law." *Id.* at 902. The *Nostrame* court then provided examples of behavior that fell short of constituting wrongful means, such as "vigorous solicitation of [a] competitor company's customers" and "sneaky or underhanded acts." *Id.* (internal quotations omitted).

Here, the allegations in the FAC fall short of alleging that Defendant engaged in wrongful conduct.  The FAC alleges that during the course of Megatron's administration of Bayer's catalog, Megatron regularly communicated with eBBDO, Megatron requested and received information from eBBDO, and eBBDO was aware of Megatron's relationship with Bayer.  FAC ¶ 17.  Plaintiff continues that eBBDO's cooperation "suddenly ceased" in August 2018 and eBBDO stopped supplying information and documents that Megatron requested.  *Id.* ¶ 18.  In December 2018, Megatron alleges, Bayer entered into an administration agreement with eBBDO.  *Id.* ¶ 19.  These allegations fall short of plausibly alleging that eBBDO's conduct was wrongful as defined by New Jersey law.  As a result, Defendant's motion to dismiss is granted.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is **GRANTED**.  An appropriate Order accompanies this Opinion.

Dated:          August 24, 2021

John Michael Vazquez, U.S.D.J.